**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**AMY D. BARTLETT o/b/o D.B., a minor,**

      **Plaintiff,**

**-vs-**                                          **Case No.  6:12-cv-585-Orl-DAB**

**COMMISSIONER OF SOCIAL**
**SECURITY,**

      **Defendant.**

_____

# MEMORANDUM OPINION & ORDER

On behalf of her infant son D.B., Plaintiff brought this action pursuant to the Social Security Act (the Act), as amended, Title 42 United States Code Section 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (the Commissioner) denying the claim for Supplemental Security Income (SSI) under the Act.

The record has been reviewed, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and the administrative record, and the pleadings and memoranda submitted by the parties in this case. Oral argument has not been requested.

For the reasons that follow, it is **ORDERED** that the decision of the Commissioner is **AFFIRMED**.

## I.   BACKGROUND

### A.   Procedural History

On July 28, 2009, an application for childhood Supplemental Security Income (SSI) was protectively filed for the minor child, D.B. (the "Child") by his mother, alleging that the Child was disabled since his birth on May 2, 2009 due to a right club foot. R. 116, 118, 265. Plaintiff's claim was denied initially and upon reconsideration. R. 47-48, 53-55, 60-62. Plaintiff timely requested a

hearing before Administrative Law Judge D. Kevin Dugan (hereinafter referred to as "ALJ") which was held on August 18, 2010. R. 33-46. In a decision issued September 8, 2010, the ALJ found the Child not disabled as defined under the Act. R. 14. Plaintiff filed a Request for Review of Hearing Decision/Order, which the Appeals Council denied on February 21, 2012. R. 4-6. Plaintiff filed this action for judicial review on April 17, 2012. Doc. 1.

### B.  Medical History and Findings Summary

The Child was fifteen months old on the day of hearing. His medical history is set forth in detail in the ALJ's decision but is primarily focused on the Child's treatment for a right club foot.

After reviewing the Child's medical records and the testimony of the Child's mother (Plaintiff), the ALJ found that the Child never engaged in substantial gainful activity. R. 20. The Child suffered from right clubfoot with residual bilateral metatarsus adductus and metatarsus adductus of the left foot, "severe" medically determinable impairments, but not impairments severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. R. 20. The ALJ further found that the subjective complaints of Plaintiff (the Child's mother) were inconsistent when compared to the medical record. R. 24. The ALJ found that the evidence established the Child had no limitation in the domains of acquiring and using information; attending and completing tasks; interacting and relating with others; caring for himself; and health and physical well-being. R. 25-30. He had less than marked limitations in the domain of moving about and manipulating objects. R. 28. Based on the limitations, the ALJ found that the Child's impairments did not functionally equal any listed impairment. R. 31. Accordingly, the ALJ determined that the Child had not been under a disability at any time through the date of the decision. R. 31.

Plaintiff now asserts four errors. First, Plaintiff contends that the ALJ failed to consider how effectively the Child could ambulate with his orthotics in place and explain why his club foot and surgery did not meet or medically equal listings 101.02 and 101.03. Second, Plaintiff argues the ALJ's

finding that the Child had less than marked limitations in the domain of moving about and manipulating objects violated SSR 09-6p and was not based on substantial evidence. Third, Plaintiff contends that the ALJ did not properly discredit Plaintiff's testimony. Fourth, Plaintiff argues that the ALJ ignored limitations in the Record. For the reasons that follow, the Commissioner's decision is **AFFIRMED**.

## II.    STANDARD OF DISABILITY AND STANDARD OF REVIEW

In order for an individual under the age of eighteen to be entitled to Supplemental Security Income payments, the Child must have a "medically determinable physical or mental impairment, which results in marked and severe functional limitations, and . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I); 20 C.F.R. § 416.906. The rules[1] follow the three-step sequential evaluation, under which SSA will consider: (1) whether the child is working; (2) whether the child has a medically determinable "severe" impairment or combination of impairments; and (3) whether the child's impairment or combination of impairments meets, medically equals, or functionally equals the severity of an impairment in the listings. 20 C.F.R. § 416.924; *see Shinn ex rel. Shinn v. Comm'r of Social Sec.*, 391 F.3d 1276, 1278-79 (11th Cir. 2004) (describing process for determining disability for children). Whether a child meets the "listing-level severity" standard is dependent upon whether the child has marked limitations in two broad areas of development or functioning or extreme limitation in one of those areas. 20 C.F.R. § 416.926a. Under the regulations for children, there are six domains used to determine a child's functional equivalence: (1) acquiring and using information; (2) attending and completing

---

[1] On August 22, 1996, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("the 1996 Act"), which amended the statutory standard for children seeking SSI benefits based on disability such that a child seeking SSI benefits based on disability will be found disabled if he or she has a medically determinable impairment "which results in marked and severe functional limitations," and which meets the statutory duration requirement. *Brawdy v. Barnhart*, No. Civ.A. SA01-CA-0835F, 2003 WL 1955839, at *3-4 (W.D. Tex. Mar. 27, 2003) (internal citations omitted). The final rules became effective on January 2, 2001. *Id.*

tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. § 416.926a.

Whether a child meets the "listing-level severity" standard is dependent upon whether the child has "marked" limitations in two broad areas of development or functioning or "extreme" limitation in one of those areas. 20 C.F.R. § 416.926a(d). Under the regulations for children, there are six domains used to determine a child's functional equivalence: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. § 416.926a. In assessing whether the Child has "marked" or "extreme" limitations, the ALJ must consider the functional limitations from all medically determinable impairments, including any impairments that are not severe, as well as the interactive and cumulative effects of the child's impairment or combination of impairments individually in each domain. 20 C.F.R. § 416.926a(c). A marked limitation "seriously interferes" with the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2). An "extreme" limitation is one that interferes very seriously with a child's ability to independently initiate, sustain or complete activities. 20 C.F.R. § 416.926a(e)(3).

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982) (internal quotations omitted).

The court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the SSA's decision. *Walker v. Bowen*, 826 F.2d 996, 1000 (11th Cir. 1987). Even if the court finds that the evidence weighs against the SSA's decision, the court must affirm if the decision is supported by substantial evidence. *Allen v. Schweiker*, 642 F.2d 799, 800 (5th Cir. 1981); *see also Swindle v. Sullivan*, 914 F.2d 222, 225 (11th Cir. 1990); *Harwell v. Heckler*, 735 F.2d 1292, 1293 (11th Cir. 1984). The court may not reweigh the evidence or substitute its own judgment, even if the court finds that the weight of the evidence is against the SSA's decision. *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980). While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusions. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Walker*, 826 F.2d at 999.

## III.   ANALYSIS

### A.   The ALJ's assessment of the Child's club foot and treatment

The Plaintiff argues that the ALJ erred by failing to consider how effectively the Child could ambulate with his orthotics in place and explain why Plaintiff's club foot and surgery did not meet or medically equal Listings 101.02 and 101.03. The Commissioner contends that the Child did not meet or medically equal the listed impairments under the Regulations. Doc. 27. Plaintiff also argues that the ALJ erred in finding that the Child had less than marked limitations in the domain of moving about and manipulating objects. Doc. 26. The Commissioner responds the ALJ properly found that the Child did not meet functionally equal the listed impairments with less than marked – rather than extreme – limitations in the domain of moving about and manipulating objects. Doc. 27.

1. *Listed Impairments 101.02 and 101.03*, *and the functional equivalent*

Plaintiff contends the ALJ erred by failing to discuss his analysis of whether the Child met the Listing level impairments and, as a result, it is not clear that he considered the claimant's right

clubfoot in combination with his left foot metatarsus adductus. Plaintiff argues that the ALJ failed to consider how effectively plaintiff could ambulate with his orthotics in place and explain why Plaintiff's club foot and surgery did not meet or medically equal Listings 101.02 and 101.03. At step three of the evaluation, the ALJ found the Child's impairments were not of listing level severity, specifically Listings 101.02 and 101.03. R. 20. Plaintiff argues that the ALJ erred in finding that Plaintiff did not meet the requirements of Listing 101.02, major dysfunction of a joint or Listing 101.03, reconstructive surgery or surgical arthrodesis of a major weight-bearing joint.

"To 'meet' a Listing, a claimant must have a diagnosis included in the Listings and must provide medical reports documenting that the conditions meet the specific criteria of the Listings and the duration requirement. See 20 C.F.R. § 404.1525(a) (d)." *Wilson v. Barnhart*, 284 F.3d 1219, 1224 (11th Cir. 2002). The ALJ has an "absolute duty" to consider the effects of a combination of impairments at step three of the sequential evaluation process when determining whether a claimant's impairments equal the requirements for a listed impairment when the listing is defined in terms of functional criteria. *Davis v. Shalala,* 985 F.2d 528, 533-34 (11th Cir. 1993).

Plaintiff alleges that the Child met "all of the specified medical criteria" to meet Listing 101.02 which provides:

> [A] gross anatomical deformity . . . and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> > A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 101.00B2b.

20 C.F.R. Part 404, Subpart P, Appendix 1 § 101.02. Plaintiff also contends that the ALJ erred in not determining whether the Child met Listing 101.03 for reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, which requires the Child "demonstrate an inability to ambulate

-6-

effectively, as defined in 101.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset."

Plaintiff argues that after the successful casting of Plaintiff's right club foot and achilles tenotomy (R. 222), when the Child was prescribed foot abduction orthoses, he "did not ambulate effectively" which meets Listing 101.02. Plaintiff points to Section 101.00B(2)(b)(1) which defines the "inability to ambulate effectively" as "an extreme limitation of the ability to walk; *i.e.*, an impairment that interferes very seriously with the child's ability to independently initiate, sustain, or complete activities." Plaintiff also argues that the ALJ should have considered Section 101.00J2 which states that children with musculoskeletal impairments may be examined "with and without the use of any orthotic,"; however, when orthotic devices are prescribed, then the "examination should be with the orthotic device in place and should include an evaluation of the child's maximum ability to function effectively with the orthosis." 20 C.F.R. Part 404, Subpt. P, Appendix 1 § 101.00J2.

Plaintiff contends that an evaluation should have been conducted of the Child's ability to ambulate with the orthosis in place although, Plaintiff argues, "it is clear" that the Child would not be able to walk with the rigid bar running between his two orthotic shoes. The Commissioner responds that the Child was too young to be expected to ambulate effectively on his own and, thus, this section discussing examination of ability to ambulate effectively is not relevant given his age or development level. The Commissioner contends that even if the Child had been old enough to have been able to walk independently, the requirement clearly specifies that the examination would require the physician to check if he could ambulate effectively without the device in place as set forth in the SSR. 20 C.F.R. Part 404, Subpt. P, Appendix 1 § 101.00J2. "It is unnecessary to routinely evaluate the child's ability to function without the orthosis in place. If the child has difficulty with, or is unable to use, the orthotic device, the medical basis for the difficulty should be documented. In such cases, if the impairment involves a lower extremity or extremities, the examination should include

information on *the child's ability to ambulate effectively without the device in place unless contraindicated by the medical judgment of a physician who has treated or examined the child.*" 20 C.F.R. Part 404, Subpt. P, Appendix 1 § 101.00J2 (emphasis added).  Plaintiff argues that, even without the orthotic device in place, the Child was having difficulty walking.  Plaintiff testified that because of the bar that holds the Child's feet in position, "he can't do anything in those shoes," and he was unable to sleep with the orthotics on his feet due to the pain.  R. 39, 42.  Plaintiff also testified that the Child had scabs where his parents tied the orthotic shoe laces tight to prevent him from kicking the shoes off, and they placed him sitting in his car seat with the orthotic shoes for a few hours at a time throughout the day and then let him out for a few hours without the shoes.  R. 40.  Plaintiff argues that the Child met Listing 101.03 because the hearing was held more than a year after the initial castings and surgery for the Child's club foot and "Dr. Ulrich noted that [the Child] could not walk."  R. 271.

The Commissioner argues that under the Social Security Regulations (SSR) the Child did not meet the regulatory definition for an "inability to ambulate effectively" because he had not reached the developmental age at eleven months when he was expected to walk.  The Commissioner argues that nothing in the record indicates that the Child's doctors attributed his inability to walk at eleven or twelve months old to his right club foot.  The Commissioner points to Section 101.00(B)(2) which states that "[t]he inability to ambulate effectively or the inability to perform fine and gross movements effectively must have lasted, or be expected to last, for at least 12 months."  In assessing children too young to be expected to walk independently: "Consideration of function must be based on assessment of limitations in the ability to perform comparable age-appropriate activities with the lower extremities, given normal developmental expectations. For such children, an extreme level of limitation means skills or performance at no greater than one-half of age-appropriate expectations based on an overall developmental assessment rather than on one or two isolated skills." 20 C.F.R.

-8-

Part 404, Subpt. P, Appendix 1 § 101.00B2b(2).  The Commissioner also contends that the ALJ appropriately determined that the Child had less than marked limitations in the domain of moving about and manipulating objects, thus, he also did not functionally meet a listing.

Plaintiff argues to the contrary, that the ALJ erred in finding the Child had "less than marked limitations" in the domain of moving about and manipulating objects when the evidence establishes that he has an extreme limitation[2].  R. 28-29.  Plaintiff contends the ALJ failed to adequately consider the Child's problems ambulating using the orthotics and Plaintiff's testimony that the Child must be held immobile in a car seat for the 12 hours while he wears the orthotics.  R. 40.  Plaintiff points to treatment records of her reports to Dr. Ashberg that the Child had irritation over the dorsum of his foot from the foot abduction orthoses, and he noted healed blisters.  R. 253.  When Plaintiff reported to Dr. Ashberg not using the abduction shoes for the past two weeks, he explained it was necessary that Plaintiff continue to use the shoes on the Child if he was to avoid a recurrence of the clubfoot deformity; he recommended revisiting the orthotist for further shoe modification. R. 253.

The domain of moving about and manipulating objects considers how a child moves his body from one place to another and how the child moves and manipulates things. 20 C.F.R. § 416.926a(j)(1). An extreme limitation is one that "interferes very seriously with your ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3). For children not yet three years old, an "extreme" limitation requires functioning at a level that is one-half of the chronological age. 20 C.F.R. § 416.926a(e)(3)(ii).

The regulations describes the assessment in this domain for children from birth to one year old:

---

[2] Plaintiff does not challenge the ALJ's finding that the Child had no limitations in the other five domains of acquiring and using information; attending and completing tasks; interacting and relating with others; caring for self; and health and physical well-being. 20 C.F.R. §416.926a(b)(1).

> At birth, you should begin to explore your world by moving your body and by using your limbs. You should learn to hold your head up, sit, crawl, and stand, and sometimes hold onto a stable object and stand actively for brief periods. You should begin to practice your developing eye-hand control by reaching for objects or picking up small objects and dropping them into containers.

20 C.F.R.926a(j)(2)(I). Social Security Ruling 09-6p also provides examples as a frame of reference for determining whether children are developmentally functioning typically for their age with respect to use of gross and fine motor skills required in this domain; from birth to age one, a child is expected to try to hold onto a stable object and stand actively for brief periods, and from age one to age three, a child is expected to begin to walk and run without assistance, and climb with increasing skill. SSR 09-6p.

The Commissioner argues the ALJ properly noted that although Plaintiff testified the Child was not reaching developmental milestones at the same time her other children had, his physicians opined that he was developing normally for his age, and his foot problems were easily correctable with the use of orthotic shoes as directed. R. 29, 241-42, 268, 271, 274. The Commissioner also argues that the medical evidence does not show that the Child's functioning was at half his chronological age, as is required to establish an "extreme" limitation.

The ALJ discussed the treatment records from Dr. Robinson at Orthopaedics of Brevard noting the Child's mother had expressed concern over his foot appearance, which was wide with some apparent residual deformity. R. 23. The Child had been in reverse last shoes, but had outgrown them and his left foot had mild club foot tendencies, but he had reportedly begun standing and cruising. The ALJ noted Dr. Robinson's assessment that the foot itself could be easily corrected to neutral with forefoot likely readily corrected. Bilateral clubfoot x-rays showed normal ankles and was negative for any other bony abnormalities. Dr. Robinson wrote a prescription for bilateral reverse last open toe shoes to be worn at least 12 hours per day. R. 23.

The ALJ also noted the treatment records from Dr. Ulrich at Pediatrics in Brevard, P.A., dated May 7, 2009 to May 3, 2010 reported the Child's physical examinations and developmental history were generally within normal limits. R. 24. Although the Child's right clubfoot was noted, "the well visits were generally unremarkable and did not indicate specific limitations due to the condition." R. 24. The ALJ noted Dr. Ulrich's exam from May 3, 2010, when the Child was a year old, "within the development section of the well visit, the checked boxes showed that the claimant stood . . . [and] the only box not checked was walking with/without support. Nevertheless, treating physician, M. Ulrich, M.D., assessed that the claimant was developmentally normal for age and culture when he was 11 months old and a year old." R. 24 (citing R. 271). The ALJ also relied on the opinions of the state agency reviewing physicians that impairment or combination of impairments did not functionally equal any listing as the claimant did not have 2 marked or I severe limitation in any of the domains. R. 24 (citing R. 233, 244).

The medical records that, on April 27, 2010, at eleven months old, the Child was examined by the orthopedist, Dr. Robinson "without the device in place" by the orthopedist, Dr. Robinson, who noted the Child had begun standing and cruising but "he sometimes walks on the right side of his right foot." R. 267-68. Dr. Robinson prescribed the use of the orthotics for at least 12 hours per day. R. 268. As the ALJ also noted, Dr. Ulrich's treatment notes of the Child noted in the specific category of "walking" and other milestones that based on the Child's age, his development was normal. R. 271. The Child was twelve months old at the time of the last doctor treatment note in the record (R. 271), and, as the Commissioner points out, children are not expected to be able to walk independently until they are between 12 and 18 months old. See Social Security Ruling (SSR) 09-6p[3] (by age one a child

---

[3]http://www.ssa.gov/OP_Home/rulings/ssi/02/SSR2009-06-ssi-02.html.

typically tries to hold onto a stable object and stand actively for brief periods); Center for Disease Control and Prevention Developmental Milestones checklists (CDC Checklist)[4].

Dr. Ulrich and Dr. Robinson both noted, at eleven months, the Child had begun standing and "cruising." R. 267, 274. Dr. Robinson performed a full examination and noted a positive history of club foot and treatment for it, but opined that "the foot itself could be easily corrected to neutral" even thought there was some dorsolateral hindfoot subcutaneous tissue atrophy. R. 268. The forefoot likewise was readily corrected. R. 268. The Child's left foot exam showed mild metatarsus adductus, also readily corrected; there was no other evidence of deformity. R. 268. Dr. Robinson prescribed bilateral reverse last open toe shoes which were to be worn at least 12 hours per day. R. 268. Dr. Ulrich likewise found at the Child's twelve month-old well-child visit that the Child did not yet walk without support but did with hand support, and his development was normal for his age and culture. R. 271. Accordingly, the ALJ's determinations that the Child's impairments did not meet Listings 101.02 and 101.03, and were "less than marked" so as not functionally meeting a listing were based on substantial evidence.

**B.     Credibility**

Plaintiff contends that the ALJ erred by failing to provide specific and adequate reasons for discrediting Plaintiff's testimony. The ALJ found that some of the Plaintiff's statements "were inconsistent when compared to the medical record." R. 24. The Commissioner argues that the ALJ's consideration of plaintiff's mother's testimony is consistent with agency policy.

Where an ALJ decides not to credit a claimant's testimony, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Jones v. Department of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated

---

[4]http://www.cdc.gov/ncbddd/actearly/milestones/milestones-1yr html.

reasons must be based on substantial evidence); *Foote v.Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995). The ALJ may consider the testimony of "non-medical sources" such as parents to show the severity of impairments and how a child typically functions compared to children the same age who do not have impairments. 20 C.F.R. § 416.913(d)(4). The ALJ is to consider whether the evidence is consistent with other evidence in the record, and should explain the weight given to opinions from the "non-medical" sources. SSR 06-03p[5]. The Commissioner argues that the ALJ complied with the regulations in considering Plaintiff's testimony because the ALJ discussed it in detail (R. 21-22) and explained the weight accorded to it.

The ALJ gave specific examples of the inconsistencies between Plaintiff's testimony and the medical notes in the record as:

> [A]lthough it was reported that the claimant was required to wear orthotic shoes for 23 hours per day, this is unconfirmed by the treating records. Although the mother testified that Dr. Ashberg had advised her to have the claimant wear high top shoes when not wearing orthotic shoes and that the claimant may need to wear special shoes for the rest of his life, these statements are unconfirmed by the treating records. Moreover, although the mother testified that the claimant's developmental milestones (such as crawling, standing, and walking) were behind that of her other children when they were the claimant's age, well check records from the pediatrician showed that the claimant was progressing within normal limits, as discussed above. Accordingly, the mother's statements have not been consistent. Although the inconsistent information provided by the mother may not be the result of a conscious intention to mislead, the inconsistencies suggest that the information provided by the mother may not be entirely reliable.

R. 24. Although Plaintiff actually testified at the hearing that the Child was required to wear the orthotic shoes for 12 hours per day[6], which was supported by the Record, she had previously reported when completing a Social Security Administration Disability Report form when the Child was five months old, that he had to wear shoes 23 hours per day. R. 39, 153, 268.

---

[5]http://ssa.gov/OP_Home/rulings/di/01/SSR2006-03-di-01 html

[6]The Commissioner erroneously stated that the "ALJ's decision incorrectly indicates Plaintiff testified the shoes be worn 23 hours per day." However, the ALJ was actually correct in this regard.

The Commissioner argues the ALJ was correct that, although Plaintiff testified Dr. Ashberg recommended wearing high-top shoes when the Child was not wearing the orthotics, and that he may need to wear special shoes for the rest of his life, those statements were not confirmed by the medical record. Additionally, the Commissioner argues, Plaintiff's testimony that the Child was slower to reach developmental milestones than his siblings, his doctors indicated he was developing normally. R. 24, 271, 274.

The ALJ accurately cited evidence in the medical records.  In addition to the notes of Dr. Robinson that the Child's club foot was "easily corrected to neutral" and Dr. Ulrich's notes that the Child was progressing within normal limits[7], Dr. Ashberg's notes indicate his opinion that "[t]he child has a mild to moderate right-sided clubfoot deformity," which was "relatively correctable."[8] R. 265. Following a series of castings and an in-office heel cord tenotomy from May to July 2009, Dr. Ashberg noted the Child's "clubfoot is well corrected" and he had tolerated the casts well. R. 220, 257. He described it as "an excellent clinical result" and "completely corrected." R. 220, 257. Dr. Ashberg did tell the parents when he examined the Child as a newborn (on May 21, 2009) that he "may require additional surgery" but that was before the casting process (R.231) and the "excellent result." At six months old, the Child's pediatrician (Dr. Ulrish) noted he could bear weight on his legs and his development was normal for his age. R. 240.

In September 2009, the Child was seen by Dr. Ashberg because Plaintiff complained that the abduction shoes were cutting into his feet and she had been having trouble with the shoes, removing the bar for the prior two weeks. R. 253.  Dr. Ashberg noted "superficial, healed blisters over the

---

[7]These notes are discussed in more detail, with citation to the Record, in the prior section.

[8]Plaintiff mentions, but does not seriously argue, that the ALJ did not adequately consider the Child's left foot deformity. Dr. Ashberg found that for the Child's left foot, he had "an easily correctable metatarsus adductus on the left. This is not a clubfoot deformity, though." R. 265. He also had described the left foot problem as "self-resolving" and "does not require treatment." R. 231.

-14-

dorsum of the patient's foot" but the Child's feet were globally nontender to palpation." R. 253.  His range of motion remained supple although there was some early recurrence of the clubfoot present. R. 253.  Dr. Ashberg explained to the Child's mother (Plaintiff) that it was necessary that the Child continue to use the shoes if he was to avoid a recurrence of his clubfoot deformity.  He recommended revisiting the orthotist for yet further shoe modification, and return for a check after that.  R. 253.

In October 2009, after adjustments were made and heel counters inserted to the Child's abduction/bar shoes, Dr. Ashberg noted that the Child's father was pleased with the Child's foot correction and there was good correction of the Child's clubfoot.  R. 241.  Dr. Ashberg noted that the "shoes were fitting nicely, and Child was doing much better "now that he is utilizing the foot abduction orthoses appropriately."  R. 252.  Dr. Ashberg again reiterated the importance of compliance.  R. 252.

By the time Dr. Robinson treated the Child at eleven months old (April 2010), he found mild convexity on the Child's right foot which was "easily corrected to neutral" and the left foot had mild metatarsus adductus which was also "readily corrected" and no other evidence of deformity.  R. 268. The Child had begun standing and "cruising," but he had outgrown his previous set of prescribed shoes, and he "sometimes *walks* on the side of his right foot."  R. 267.  Dr. Robinson prescribed bilateral reverse last open toe shoes which were to be worn "at least 12 hours per day."  R. 268.  Less than a month later, Dr. Ulrich noted that the Child was walking "with support" using his hands.  R. 271.

The ALJ's determination finding that some of Plaintiff's statements to be inconsistent when compared to other evidence in the record, such as the pediatrician's and orthopedists' treatment notes, was based on substantial evidence.

**C. Other alleged functional limitations**

Plaintiff additionally contends that the ALJ ignored additional limitations in the record in his determination that "no treating source has set forth functional limitations in light of the [Child's] impairments." R. 24. Plaintiff argues that the ALJ erred in failing to acknowledge that Dr. Robinson ordered the Child to be in the orthotics for at least 12 hours each day, and that the orthotic shoes have a solid bar that connects them, which would interfere with Plaintiff's ability to walk with such an orthotic in place. Plaintiff also argues that the treatment was not entirely successful in that Dr. Robinson noted that while Plaintiff had begun standing and cruising, "he sometimes walks on the side of his right foot." R. 267. Also, for Plaintiff's one year old well visit, Dr. Ulrich, noted that Plaintiff still had a right club foot. R. 271.

The Commissioner argues that the ALJ properly considered the evidence and, in fact, specifically mentioned that Dr. Robinson advised the Child needed to wear the shoes for 12 hours per day. R. 23. The Commissioner argues that "the need to wear orthotic shoes for 12 hours a day" is not a functional limitation, and Dr. Robinson's examination showed that the Child did not have any significant functional limitations.

As noted previously, Dr. Robinson opined that the Child's mild club foot was easily correctable. R. 268. The bilateral reverse shoes were part of a treatment plan to prevent any functional limitation from resulting from a clubfoot recurrence, and the parents had been advised to make sure the Child wore the shoes to avoid a recurrence. R. 268. The ALJ's determination that the Child did not have functional limitations from Dr. Robinson was based on substantial evidence.

## IV.  CONCLUSION

The record in this case shows that the Child was born with a right clubfoot impairment, but it was considered by orthopedists to be "correctable," and he has been receiving the appropriate treatment. The ALJ appropriately considered the Child's circumstances and analyzed them in relation

to the exacting disability standard under the Social Security Act.  For the reasons set forth above, the ALJ's decision is consistent with the requirements of law and is supported by substantial evidence.  Accordingly, the Court **AFFIRMS** the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g).  The Clerk of the Court is directed to enter judgment consistent with this opinion and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on July 3, 2013.

*David A. Baker*
DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record